**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| CORY SITTON,<br>JANET TRAWICK,<br>and MORIAH ADKINS,<br>on behalf of Plaintiffs and<br>the class members described herein,<br><br>Plaintiffs,<br><br>v.<br><br>ROBINSON ECONOMIC SERVICES,<br>also known as ROBINSON ECONOMIC<br>SERVICES, LLC, doing business as<br>CLEAR AIR LENDING;<br>ROBINSON ECONOMIC DEVELOPMENT<br>CORPORATION;<br>CT2022 FIN 1 LLC;<br>BORROWWORKS FINANCIAL, INC.;<br>BORROWWORKS DECISION SCIENCE, INC.;<br>BENJAMIN E. GATZKE;<br>JEFF FORSEY;<br>and DOES 1-20,<br><br>Defendants. | ) | Case No. 1:25-cv-01535-JPH-MG |

**AMENDED COMPLAINT**

1. Plaintiffs Cory Sitton, Janet Trawick, and Moriah Adkins bring this action to secure redress from predatory and unlawful loans (such as Exhibits H-K). The loans are ostensibly made by Defendant Robinson Economic Services, also known as Robinson Economic Services, LLC, doing business as Clear Air Lending ("Clear Air Lending"), and its parent Defendant Robinson Economic Development Corporation ("REDC"). These entities purport to be owned by "the Robinson Rancheria of Pomo Indians of California," a federally recognized Indian tribe. In fact, the loans are funded by CT2022 FIN 1 LLC ("CT2022"), a non-native American business located in Arkansas, which is operated by Total Management, Inc. ("TMI") (prior to dissolution), BorrowWorks Financial, Inc. ("BorrowWorks"), BorrowWorks Decision Science, Inc. ("BWDS"), Benjamin E. Gatzke, Jeff Forsey, and Does 1-20.

2. Plaintiffs seek damages under the Indiana Uniform Consumer Credit Code (Count I) and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count II).

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal question), 28 U.S.C. § 1332(d) (Class Action Fairness Act), 18 U.S.C. § 1964 (RICO), 28 U.S.C. § 1337 (interstate commerce), and 28 U.S.C. § 1367 (supplemental jurisdiction).

4. This Court has personal jurisdiction over Defendants because they:

a. Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers, and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b. Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

5. Venue is proper because acts to obtain and collect the loans impacted Plaintiffs in Indiana.

6. Article III is satisfied because actions for statutory damages and invalidation of loans

for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008) (summarizing statutes allowing 5% to 8% interest).

## PARTIES

### Plaintiffs

7. Plaintiffs are citizens of Indiana residing as follows:

   a. Cory Sitton: Bargersville, Indiana.

   b. Janet Trawick: Indianapolis, Indiana.

   c. Moriah Adkins: Shelbyville, Indiana.

### Defendants

### Clear Air Lending and Robinson Economic Development Corporation

8. Defendant Clear Air Lending states on its website www.clearairlending.com that it is a "corporate subdivision of the Robinson Economic Development Corporation, a wholly owned federally chartered corporation and an economic development arm of the Robinson Rancheria of Pomo Indians of California (the "Tribe"), a federally recognized and sovereign Native American Indian Tribe." (Exhibit A) Plaintiffs dispute this. It uses the addresses P.O. Box 1429, Nice, CA 95464 and 1545 E. State Highway 20, Nice, CA 95464-8619.

9. Defendant REDC is a corporation with offices at 1545 E. State Highway 20, Nice, CA 95464-8619.

10. Clear Air Lending and REDC are the nominal makers of high-interest Internet loans via the website www.clearairlending.com.

11. The website is registered to an address in Ukiah, California, about thirty miles from the Robinson Rancheria. (Exhibit B)

**CT2022**

12. Defendant CT2022 is a limited liability company organized under the laws of Oklahoma with its principal office at 5608 S. 14th Street, Fort Smith, AR 72901. Its registered agent and office is Capitol Document Services, Inc. 1833 S. Morgan Road, Oklahoma City, OK 73128.

13. CT2022's principal office, 5608 S. 14th Street, Fort Smith, AR 72901, is a small office building that houses a number of high-interest lenders as well as TMI (prior to dissolution).

14. Defendant CT2022 provides funds used to make loans via www.clearairlending.com.

15. To secure repayment, CT2022 has filed UCC-1 financing statements (Exhibits C-D) against Clear Air Lending and REDC, disclosing a security interest in "any and all net receipts, receivables, net revenues, and rents received by the Debtor from the operation of any business or enterprise or otherwise," "all present and future deposit accounts of the Debtor, including but not limited to the Collateral Deposit Account and the Collection Account, the funds on deposit and all proceeds therefrom, and any and all certificates of deposit," "all property and assets, real or personal, tangible or intangible, now existing or hereafter acquired, of Debtor," and "Eligible Assets."

16. "Eligible Assets" are defined as "all consumer loans made pursuant to Consumer Contracts if such Consumer Contracts: (a) comply with the Eligibility Criteria established by Debtor and Lender; and (b) are pledged to lender and in respect of which Lender has a perfected first priority lien not subject to any other liens or claims of any kind."

17. "Consumer Contract" is defined to mean "(a) a cash advance contract and the Truth in Lending Act disclosure executed by a Consumer Obligor in favor of Debtor relating to an unsecured consumer loan made in conformity with all applicable Consumer Financial Services Laws and Tribal Laws with a Consumer Obligor; (b) all rights, title, and interest, including all rights of repayment, under the Consumer Contract Documents and all instruments and documents arising therefrom or relating thereto; and (c) all proceeds arising therefrom or relating thereto (including, but not limited to, any personal property (if any) acquired in connection with the exercise of any

remedy relating to a Consumer Contract."

18. "Consumer Contract Documents" are defined as "all instruments, promissory notes, documents, and agreements entered into, by a Consumer Obligor with Debtor, and evidencing or executed in connection with the application for or disclosure with respect to a Consumer Contract, including, but not limited to, a Consumer Contract."

19. Thus, CT2022 has a security interest in all loans made via www.clearairloans.com and the proceeds of such loans. The extent of the security interest makes CT2022 the sole source of funding for loans made through www.clearairloans.com.

20. The UCC-1 filing was made by Connor & Winters, a law firm whose declared fields of practice include Indian Law and tribal sovereign immunity, and which has previously been involved with "rent a tribe" lending operations. *Martorello v. Williams*, No. 19-MC-5-JED-JFJ, 2019 U.S. Dist. LEXIS 63881 (N.D. Okla. Apr. 15, 2019) (Exhibit E).

**TMI**

21. TMI is a Delaware corporation that is now dissolved. Its former principal business address was 1845 Shelby Lane, Fayetteville, AR 72704.

**Gatzke**

22. Defendant Gatzke is the Chief Executive Officer of TMI (prior to dissolution) and BorrowWorks. He resides at 4400 Ledgeview Rd., Fort Worth, TX 76109.

23. As Chief Executive Officer, Gatzke is responsible for, and controls, the management and operations of TMI (prior to dissolution) and BorrowWorks, and is therefore personally responsible for its acts, omissions, and violations.

24. Gatzke holds a Master of Business Administration degree from Baylor University. In the university's magazine from Winter 2017, Gatzke notes that he is the "CEO of Total Management Inc." (Exhibit F) He also identifies his employer as "Total Management Inc." and his position as "President" on disclosures to the Federal Election Commission ("FEC") regarding his contributions to the Online Lenders Alliance Political Action Committee. (Exhibit G)

25. Gatzke previously served as Chief Technology Officer at Think Finance, a now-bankrupt company which engaged in a "rent-a-bank" scheme with the First Bank of Delaware, and offered short-term online loans at interest rates often exceeding 200% annually. The loan product was called ThinkCash.

26. After regulators investigated the First Bank of Delaware and ultimately stripped it of its bank charter, Think Finance pivoted to a "rent-a-tribe" model and made loans to consumers under the name Plain Green loans, at interest rates often exceeding 500% annually.

27. Plain Green loans were, ostensibly, made by the Chippewa Cree Tribe of Rocky Boys Indian Reservation, a small, impoverished tribe in a remote part of Montana. Lawsuits brought by the Attorney General for the Commonwealth of Pennsylvania and the Consumer Financial Protection Bureau resulted in the bankruptcy of Think Finance.

**Forsey**

28. Defendant Forsey resides at 7468 Prairieside Drive, Fort Worth, TX 76123. Forsey was previously the Chief Executive Officer of ACC Management, which owned 45 different storefront payday lenders. ACC Management is located at 5608 S. 14th Street, Fort Smith, AR 72901.

29. Since 2011, Forsey has also been the Chief Compliance Officer of BorrowWorks.

**BorrowWorks and BWDS**

30. Defendant BorrowWorks is a Texas corporation with a principal business address of 6445 Harris Parkway, Ft. Worth, TX 76132. Its registered agent is Andrew Selking at that address.

31. Defendant BWDS is a Delaware corporation with a principal business address of 6445 Harris Parkway, Ft. Worth, TX 76132. Its registered agent is Corporation Trust Company, 1209 Orange St., Wilmington, DE 19801.

**Does**

32. Defendants Does 1-20 are other natural or artificial persons involved in the making or funding of short-term, high-interest loans via www.clearairlending.com.

## FACTS

33. Defendants made loans in the name of Clear Air Lending and REDC to the Plaintiffs as follows:

| Name | Date | Exhibit | Principal | Disclosed APR |
|---|---|---|---|---|
| Sitton | 4/25/24 | H | $1,000 | 699.9970% |
| Trawick | 7/17/24 | I | $1,000 | 699.8744% |
| Adkins | 2/10/25 | J | $850 | 624.8962% |
| Adkins | 4/30/25 | K | $1,000 | 524.9994% |

34. Most Plaintiffs made one or more payments on the loans.

35. Defendants wired the loan proceeds to Plaintiffs' respective bank accounts in Indiana.

36. Defendants debited payments from the same Indiana accounts.

37. Defendants claim that amounts are still outstanding.

38. Exhibits H-K are written on a standard form loan agreement used by Defendants on a regular basis.

39. Defendants regularly make loans to individuals in Indiana at such rates.

40. The loans were obtained for personal, family or household purposes and not for business purposes.

41. The website www.clearairlending.com states, "The Tribe does not allow access or accept applications for this service from residents of all locations, and the service may or may not be available at your location. The location from which the tribe chooses to allow access to its jurisdiction may change from time to time without notice." (Exhibit A)

42. Defendants were aware that Indiana and other states have rate limitations that applied to their loans.

43. Defendants determined which states to make loans in based on their estimation of the likelihood of public or private enforcement.

44. Defendants decided to ignore Indiana's rate limitations because they concluded that Indiana authorities were unlikely to take action to enforce them against them.

45. Plaintiffs were in Indiana at all times.

46. At no time did Plaintiffs visit the Tribe's lands or any business premises of any Defendant in connection with the loan.

47. On information and belief, while the Tribe is the nominal owner of REDC and Clear Air Lending, covenants in the lines of credit used as working capital to fund loans require the Tribe to hire only investor-approved managers, underwriters, marketers, software vendors, and other service providers.

48. On information and belief, the loan covenants also require the Tribe to waive sovereign immunity with respect to the non-tribal investors, leaving the Tribe vulnerable to legal action.

49. Thus, the Tribe exerts no meaningful control over the business, how it is operated, who it lends to, and so forth. Any tribal involvement does not go beyond the hiring of a handful of tribal members to work as phone customer service representatives or similar low-level jobs.

**<u>RENT-A-TRIBE SCHEME AND INVALIDITY OF CLAIM OF TRIBAL IMMUNITY</u>**

50. In an attempt to evade prosecution under usury laws of states like Indiana, online lenders frequently create an elaborate charade claiming their otherwise illegal businesses are entitled to the sovereign immunity of Native American tribes.

51. The illegal loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

52. In exchange for use of the tribe's name, the beneficial owner of the payday lending

scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

53. However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

54. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

55. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, are conducted by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

56. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

57. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

58. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal

sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

59. The loans nominally made by Clear Air Lending and REDC are in fact funded via CT2022.

60. The member and controller of CT2022 are business associates of Gatzke, Forsey, and ACC Management.

61. BWDS develops and utilizes software to predict the repayment abilities of consumers who apply for online loans with exceedingly high interest rates, as well as the propensities of the consumer to actually pay the loans.

62. Software developed by BWDS was utilized in the underwriting of Plaintiffs' loans.

63. BWDS software is written specifically with lenders like Clear Air Lending and REDC in mind, e.g., lenders which charge 400% or more interest rates.

64. At all times, BWDS is aware its software is used in the furtherance of loans with interest rates exceeding 400% annually.

65. TMI (prior to dissolution) orchestrated and directed the lending operation.

66. TMI (prior to dissolution), BorrowWorks, and BWDS and their contractors and hired agents are in actualcontrol of nearly all aspects of Clear Air Lending and REDC, including underwriting, lending decisions, collection strategies, credit reporting, and the sale of charged-off debts to debt collectors.

67. The line of credit from CT2002 provides Clear Air Lending and REDC with access to the millions of dollars in working capital it needed to fund loans.

68. On information and belief, based on the typical contents of such agreements, the CT2002 line of credit agreement provided:

a. The Tribe waived any sovereign immunity claims in the event of a dispute with TMI, BorrowWorks, and BWDS.

b. The Tribe would employ only contractors approved by TMI, BorrowWorks, and BWDS.

c. Money due TMI, BorrowWorks, and BWDS would be given priority.

d. Various restrictive covenants gave TMI, BorrowWorks, and BWDS control over the "tribally" operated Clear Air Lending and REDC.

69. TMI (prior to dissolution), BorrowWorks, and BWDS or their related companies approved Plaintiffs for their loans, in all meaningful ways.

70. Any "tribal" approval was simply a charade done for the purpose of providing legal cover, and involved nothing more than a pro forma rubber-stamping of the approval generated by TMI (prior to dissolution), BorrowWorks, and BWDS or their related companies.

71. An applicant for a loan from Clear Air Lending and REDC who does not meet the qualifications established by TMI (prior to dissolution), BorrowWorks, and BWDS or their related companies will not be offered a loan.

72. The only meaningful contribution the Tribe makes is that TMI (prior to dissolution), BorrowWorks, and BWDS and/or their related companies can claim Clear Air Lending and REDC operate under Tribal law and to invoke the tribe's sovereign immunity to attempt to avoid state usury laws. Only low-level functions occurred on the Tribe's land. Clear Air Lending and REDC are not permitted to make loans denied by TMI (prior to dissolution), BorrowWorks, and BWDS.

73. The purported beneficial owner of Clear Air Lending and REDC is a small, economically depressed, isolated tribe in rural California.

74. Ultimately, the Tribe retains roughly two cents on the dollar of revenue generated by Clear Air Lending and REDC, after paying various management fees, consulting fees, technology fees, interest on the line of credit, and other sums to CT2022, TMI (prior to dissolution),

BorrowWorks, and BWDS.

75. The various fees and interest have to be repaid to CT2022, TMI (prior to dissolution), BorrowWorks, and BWDS prior to any payments to the Tribe, meaning that the non-tribal economic interests come before those of the Tribe's.

76. In the event a particular loan is charged-off as uncollectable prior to at least the original principal loan amount being paid, CT2022, TMI (prior to dissolution), BorrowWorks, and BWDS absorb the loss, not the tribe.

77. Thus, CT2022, TMI (prior to dissolution), BorrowWorks, and BWDS, and not the Tribe, are the true lenders of the loans made to Plaintiffs, because they have the predominant economic interest in loans made to consumers by Clear Air Lending and REDC.

78. Since nearly all meaningful activity concerning the loans made by Clear Air Lending and REDC does not occur on an Indian reservation, regardless of whether certain administrative aspects are addressed on the Tribe's land, the loans were not made "on" the reservation.

79. A significant majority of the transactions occur within Indiana—from completing the application to receiving the funds.

80. Plaintiffs, like most customers of Clear Air Lending and REDC, acquired their loans without leaving home. The loan proceeds were deposited into Plaintiffs' respective Indiana bank accounts, and withdrawals and attempted withdrawals were made from the same accounts. Communications, including emails and text messages, were sent to Indiana.

81. The location of the consumer determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

## INDIANA REGULATION OF LENDING

82. The Indiana Uniform Consumer Credit Code establishes a maximum loan finance

charge of 36% per annum for consumer loans.

83. With respect to loans other than supervised loans, Ind. Code § 24-4.5-3-201, provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

84. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

> Loan finance charge for supervised loans.
>
> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.
>
> (2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:
>
> > (a) the total of:
> >
> > > (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;
> > >
> > > (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
> > >
> > > (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or
> >
> > (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

85. There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq.*, but it does not authorize Defendants' rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

86. Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

(1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.

(2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).

(3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).

(4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

87. The amount of finance charge provided for in Exhibits H-K is more than double that permitted in Indiana under any provision.

88. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

(c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

(d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

(e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

(f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise

transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

89. Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and ***if the debtor has paid an excess charge the debtor has a right to a refund***. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) ***If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.*** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges

> arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .
>
> (7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.
>
> (8) In any case in which it is found that a creditor has violated this Article, the court may award ***reasonable attorney's fees*** incurred by the debtor. . . . (Emphasis added)

**COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE**

90. Plaintiffs incorporate paragraphs 1-89.

91. Because the loans made to Plaintiffs violated the rate limits set by Indiana law, and the violation was intentional, Plaintiffs and other borrowers are entitled to ten (10) times the amount of the excess charge.

**CLASS ALLEGATIONS**

92. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

93. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of Clear Air Lending LLC at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

94. Plaintiffs may alter the class definition to conform to developments in the case and discovery.

95. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

96. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect

illegal loans.

97. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

98. Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

99. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible; and

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

i. Statutory damages;

ii. Attorney's fees, expenses, and costs; and

iii. Such other or further relief as is appropriate.

**COUNT II – RICO**

100. Plaintiffs incorporate paragraphs 1-89.

101. This claim is against CT2022, BorrowWorks, BWDS, Gatzke, Forsey, and Does 1-20, who are the RICO "persons."

102. All loans made in the name of Clear Air Lending to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

103. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

104. Clear Air Lending is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

105. Defendants CT2022, BorrowWorks, BWDS, Gatzke, Forsey, and Does 1-20, are associated with this enterprise, in that they control it.

106. Defendant CT2022, BorrowWorks, BWDS, Gatzke, Forsey, and Does 1-20, conducted or participated in the conduct of the affairs of Clear Air Lending through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

107. Plaintiffs were deprived of money as a result.

## CLASS ALLEGATIONS

108. Plaintiffs bring this claim on behalf of a class.

109. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of Clear Air Lending at more than 72% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

110. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

111. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether the loans at issue are "unlawful debts" as defined in RICO.

b. Whether Clear Air Lending is an "enterprise."

c. Whether CT2022, BorrowWorks, BWDS, Gatzke, Forsey, and Does 1-20 are associated with Clear Air Lending.

d. Whether Defendants CT2022, BorrowWorks, BWDS, Gatzke, Forsey, and Does 1-20 each conducted or participated in the affairs of Clear Air Lending through a pattern of making and collecting unlawful loans.

112. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

113. Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

114. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible; and

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

i. Treble damages;

ii. Attorney's fees, litigation expenses, and costs of suit; and

iii. Such other or further relief as the Court deems proper.

*/s/Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (IL ARDC 0712094)
Heather A. Kolbus (IL ARDC 6278239)
Alexandra Huzyk (IL ARDC 6349537)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on October 9, 2025, I electronically filed the foregoing document via the Court's CM/ECF system, which sent notice via email to all counsel of record. I further certify that a copy of the foregoing document was sent via U.S. Mail and email to the following:

BorrowWorks Financial, Inc.
c/o Thad A. Titze
Robins Kaplan LLP
150 E 4th Place, Suite 704
Sioux Falls, SD 57104
Ttitze@RobinsKaplan.com

BorrowWorks Decision Science, Inc.
c/o Thad A. Titze
Robins Kaplan LLP
150 E 4th Place, Suite 704
Sioux Falls, SD 57104
Ttitze@RobinsKaplan.com

Benjamin E. Gatzke
c/o Thad A. Titze
Robins Kaplan LLP
150 E 4th Place, Suite 704
Sioux Falls, SD 57104
Ttitze@RobinsKaplan.com

Jeff Forsey
c/o Thad A. Titze
Robins Kaplan LLP
150 E 4th Place, Suite 704
Sioux Falls, SD 57104
Ttitze@RobinsKaplan.com

I further certify that the foregoing document was sent by U.S. Mail to the following:

CT2022 FIN 1 LLC
c/o Registered Agent
Capitol Document Services, Inc.
1833 South Morgan Road
Oklahoma City, OK 73128

*/s/Daniel A. Edelman*
Daniel A. Edelman

**JURY DEMAND**

Plaintiffs demand trial by jury.

*/s/Daniel A. Edelman*
Daniel A. Edelman

**NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 S. Clark Street, Suite 1800
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## DOCUMENT PRESERVATION DEMAND

Each Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, loan, sale or file associated with Plaintiff, and any account or loan or number or symbol relating to them. These materials are likely very relevant to the litigation of these claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that such Defendant request that the third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of each Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

T:\40913\Draft Amended Complaint_.WPD